Estate of Jessie Ring Garrett, Deceased, Edward I. Garrett, Executor v. Commissioner.
Estate of Jessie Ring Garrett v. Commissioner
Docket No. 35955.
United States Tax Court
1953 Tax Ct. Memo LEXIS 95; 12 T.C.M. (CCH) 1142; T.C.M. (RIA) 53329; October 7, 1953
*95 1. The decedent, who died in March 1947, owned one-eighth of the stock of a family corporation which owned one-sixth of the stock of a logging company. The logging company was exhausting its timber available for lumber but owned considerable timber usable for pulp. In 1946 and 1947 discussions were carried on concerning the sale of its assets or its stock. In November 1947 the sale of a controlling interest in the logging company's stock was consummated. The family corporation was dissolved and its assets distributed. In August 1948 on liquidation of the logging company the decedent's estate received $357,443.27 the interest derived from the family corporation's common stock. The estate tax return valued this stock at $63,055.43. Held, the value of decedent's stock was $357,443.27. 2. Value of other stocks determined. 3. The decedent furnished most of the funds for building a new residence in 1936. Her husband, to equalize their contributions, gave her a ten-year non-interest bearing note and made book entries indicating that he owned her $28,000. The decedent destroyed the note and requested elimination of the book record, which was done, and a gift tax return was filed shortly before *96 her death reporting forgiveness of the debt as a gift. Held, this transaction was not a gift made in contemplation of death. 4. The decedent promised her son to pay monthly amounts if he would rent and occupy a certain residence near her. She made three payments before her death. Held, the son's compliance was not a consideration in money or money's worth and did not create a debt due him by the decedent. 5. At the executor's request the Court ordered payment from the estate of $400 per month for the care and support of the decedent's adopted daughter to continue during administration. Held, this allowance is deductible as a payment for the support of dependents. H. B. Jones, Esq., 610 Colman Building, Seattle, Wash., Albert Olsen, Esq., and A. R. Kehoe, Esq., for the petitioner. John H. Pigg, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined a deficiency in estate tax of $148,717.94. After concessions and stipulations the issues are reduced to six, three of which relate to the valuation of certain stocks. The remaining issues are whether the forgiveness of a debt said to have been owed by the decedent's husband *97 was a transfer made in contemplation of death, whether a claim of the decedent's son is an allowable deduction as a debt of the decedent, and whether a support allowance paid for the benefit of the decedent's adopted daughter is an allowable deduction. Some of the facts are stipulated. The return was filed with the collector of internal revenue at Tacoma, Washington. Findings of Fact The stipulated facts are so found and the stipulation and exhibits attached are incorporated herein by reference. Jessie Ring Garrett, the decedent, died at Seattle, Washington, on March 22, 1947, leaving an estate subject to probate in King County, Washington, and leaving a last will and testament naming Edward I. Garrett, the decedent's husband, as executor. The will was duly admitted to probate and Edward I. Garrett was duly appointed and since has been the duly qualified and acting executor of such last will and testament and of the estate of the decedent. The decedent was the daughter of Clark L. Ring and Elizabeth Merrill, and was the sister of Elizabeth Ring Mather. She was the mother of Edward Peter Garrett and Rose Ring Nelson, and grandmother of Jessie Anne Nelson, who was legally adopted by *98 Edward I. Garrett and the decedent as their daughter. Elizabeth Merrill was the sister of Richard D. Merrill. The Ring and Merrill families had extensive interests in timber operations in the Pacific Northwestern States and Canada. The decedent's will was dated November 16, 1944. It was amended by two codicils dated April 1, 1946, and October 31, 1946. By the will, as amended, the residue of the estate after certain specific bequests was devised in trust to the People's National Bank of Washington, Edward I. Garrett and Edward Peter Garrett as Trustees, under broad powers of management. It was provided that from the annual income $400 per month should be paid Jessie Anne Nelson and the remainder paid to Edward I. Garrett during his life. Upon his death, one half the income was to be distributed to Edward Peter Garrett and the remainder to Jessie Anne Nelson except for any amount necessary for the support of her mother, Rose Ring Nelson, who had substantial means of her own. The will appointed Edward I. Garrett as executor and authorized him to take possession and proceed to allow and pay or reject all claims and to administer the estate and distribute the estate according to the will *99 without the intervention or supervision of any court except to admit the will to probate, direct the publication of notice to creditors, receive the inventory, appoint appraisers and enter a decree of solvency and to take such steps as may be required by state law to enable the executor to administer the estate without the further intervention or supervision of any court. On or before June 22, 1948, the executor filed an estate tax return for the estate of the decedent, adopting the date of death as the basic valuation date. The return listed as property owned by the decedent a half interest in the family home and grounds, 39 descriptions of stocks and bonds, cash in five bank accounts, certain bonds, stock or notes owned jointly by the decedent and her sister, and various miscellaneous assets, including interests in community property. Among the stocks listed were 1,251 1/3 shares of Clark L. Ring Corporation common valued at $50.39 per share, or $63,055.43; 2,852 shares of Clark L. Ring Corporation preferred at $4 per share, or $11,408; 1,251 1/2 shares of Ring Company common at $48.80 per share, or $61,077.64; 2,852 shares of Ring Company preferred at $1 per share, or $2,852; and *100 2,700 shares of Weyerhaeuser Timber Company common at $59 per share, or $159,300. Under the heading "Transfers during Decedent's Life" the following was stated: "In 1946 the decedent forgave a debt in the sum of $25,256.86 owed to her by her husband, Edward I. Garrett, created approximately ten years prior thereto. The decedent at all times refused to accept repayment of this amount." * * * The schedule of debts listed 28 items, including: Peter Garrett - contractual obligation $1,350.00. Under the heading "Support of Dependents" a claim was made for $14,400 as allowance for the care, support, maintenance and education of Jessie Anne Nelson at the rate of $400 per month as allowed by order of the Superior Court for the period of administration which was estimated at 36 months. The return reported a gross estate of $1,011,018.81 and the deductions claimed amounted to $99,234.97. A net estate tax of $242,600.12 was reported. The Polson Logging Company was organized in 1903 by Alexander Polson, Robert Polson, Thomas D. Merrill, Clark L. Ring and Richard D. Merrill with an initial authorized capital of 8,000 shares of common stock with a par value $100of per share. Subsequent thereto, *101 sometime in 1928 its Articles of Incorporation were amended to authorize the issuance of 30,000 shares of $100 par value preferred stock. This stock was distributed to the common stockholders of Polson Logging Company in proportion to their stock holdings. Clark L. Ring Corporation was organized as a Delaware corporation in 1923 by Clark L. Ring with an authorized capital stock of 10,000 shares of common stock with a par value of $100 per share. Shortly after organization, Clark L. Ring transferred certain assets, including 1,333 1/3 shares of stock in Polson Logging Company in exchange for all the authorized stock of Clark L. Ring Corporation. In 1930 the Company amended its articles to authorize the issuance of 8,000 shares of preferred stock having a par value of $100 per share, bearing 6 per cent cumulative dividends, and redeemable at $103 per share. All voting rights were vested in the holders of preferred stock. Common was to have no voting rights until the redemption of the preferred. In January of 1931 the preferred stock of Clark L. Ring Corporation was distributed as an extra dividend to the common stockholders to be charged on the books of the company against paid-in surplus. *102 At that time the common stock ownership was as follows: Clark L. Ring
6,942 shares
Jessie Ring Garrett
1,250 shares
Lithgow & Company
1,250 shares
Detroit Security & Trust Co.
556 shares
J. C. Hewitt
1 share E. M. MacQueen
1 share On March 7, 1931, Clark L. Ring transferred 6,940 shares of common stock of Clark L. Ring Corporation to The Guardian Trust Company of Cleveland, Ohio, Edward I. Garrett and William G. Mather, as trustees, in trust for the benefit of Jessie Ring Garrett and Elizabeth Ring Mather and their issue. The United States Trust Company of New York succeeded The Guardian Trust Company as a trustee of this trust. Clark L. Ring died in January 1933. Prior to 1947, liquidating dividends totalling $96 per share had been paid to preferred stockholders of Clark L. Ring Corporation, leaving a balance of $4 owing on account thereof plus $3 premium upon final redemption, so that on March 22, 1947, the amount required fully to redeem the preferred stock was $7 per share. In November 1946 the stockholders of the Clark L. Ring Corporation organized the Ring Company to which was transferred all miscellaneous assets of Clark L. Ring Corporation, except the common and preferred stock of Polson *103 Logging Company. In exchange for the transfer of these assets, the Corporation received 8,000 shares of $1 par value preferred stock and 10,000 shares of $1 par value common stock of Ring Company. The 8,000 shares of preferred stock of Ring Company thus acquired by Clark L. Ring Corporation was distributed to the preferred stockholders of the Corporation and the 10,000 shares of common stock of Ring Company was distributed to the common stockholders of the Corporation. On March 22, 1947, the outstanding stock of Clark L. Ring Corporation and of the Ring Company was owned as follows: Clark L. Ring Corp.
Ring Company
Preferred
Common
Preferred
Common
Jessie Ring Garrett
2,852
1,251 1/3
2,852
1,251 1/3
Elizabeth Ring Mather
2,852
1,251 1/3
2,852
1,251 1/3
Edward I. Garrett
1,852
1 1/3
1,852
1 1/3
United States Trust Co., N. Y.
0
6,940    0
6,940    First National Bank of Santa Fe
444
556    444
556    Totals
8,000
10,000    8,000
10,000    The United States Trust Company of New York held the above stocks as Trustee under the aforementioned agreement dated March 7, 1931, for the benefit of Jessie Ring Garrett and Elizabeth Ring Mather. The First National Bank of Santa Fe held the above stocks as Trustee under an agreement *104 for the benefit of Thomas L. Ring, son of Clark L. Ring. The only assets of Clark L. Ring Corporation outside of cash in the amount of about $18,000 on March 22, 1947, were 5,000 shares of $90 par value preferred stock of Polson Logging Company, and 1,333 1/3 shares of $100 par value common stock of Polson Logging Company. As of the date of Jessie Ring Garrett's death on March 22, 1947, the outstanding stock of Polson Logging Company was owned as follows: No. of Shares
Name
Preferred
Common
Arnold Polson and Alexander
McLain Polson, Trustees un-
der voting Trust Agreement
dated December 23, 1941
15,000
4,000    Clark L. Ring Corporation
5,000
1,333 1/3
The Dixmont Company
5,000
1,333 1/3
R. D. Merrill Company
5,000
1,333 1/3
The Dixmont Company was owned and controlled by the heirs of T. D. Merrill, and R. D. Merrill Company was owned and controlled by R. D. Merrill and his family. Clark L. Ring Corporation embarked upon a policy of gradual liquidation in about the year 1932. Between that time and the year 1941 various liquidating dividends were paid by this corporation to its preferred stockholders and in addition to distribution from earnings, it paid some dividends on common stock out of capital. *105 During the years 1942 to 1947 Clark L. Ring Corporation paid dividends as follows: Nature of
Preferred
Common Stock
Year
Distribution
Stock
From Earnings
From Capital
1942
Cash
$13,500
$75,016.16
$ 9,983.84
1943
Cash
2,400
45,692.89
9,307.11
1944
Cash
2,400
19,774.15
300,225.85
1945
Cash
2,400
12,824.01
187,175.99
1946
Cash
2,360
34,156.41
35,843.59
1946
Stock of
8,000
821,442.08
Ring Co.
(book value)
1947
Cash
960 At all times material to this proceeding, prior to its dissolution in December 1947, Edward I. Garrett was president of Clark L. Ring Corporation and at all times was president of Ring Company. The following is a condensed balance sheet of Clark L. Ring Corporation as of March 31, 1947: ASSETS
Cash
$ 18,039.91
Tax refund receivable
70.19
Polson Logging Co. - common
stock
863,538.31
Polson Logging Co. - preferred
stock
131,963.28
$1,013,611.69
LIABILITIES AND CAPITAL
Items payable
$ 1,326.72
Reserve for taxes
15,556.23
Preferred stock 8,000 shares and
common stock 10,000 shares
less deficit
996,728.74
$1,013,611.69
The stockholders and directors of Polson Logging Company were not in harmony. The Polson family, holding half the stock and having three representatives on the board of directors, were in disagreement with the Merrill and *106 Ring interests, holding the other half of the stock and having three representatives on the board after 1945. The factions were unable to agree upon a seventh director. Arnold Polson was general manager. Garrett was vice president and chairman of the executive committee which included R. D. Merrill and Arnold Polson. The directors representing the Merrill and Ring interests were older than those representing the Polson family and were apprehensive that the death of one of their number would give control to the Polson faction. Polson Logging Company owned nearly 1.2 billion board feet of standing timber in western Washington. About 10 to 12 per cent of this was fir, some 40 to 45 per cent cedar, some 35 per cent hemlock and the remainder was principally white fir. The company owned a sawmill built about 1912 which had a capacity to cut 200,000 board feet per day. During the 1920's Polson cut as much as 200 million board feet in a year. After 1936 the operations were reduced and cutting was less than 100 million board feet per year. Polson owned some 45 miles of logging railroad and some 90,000 acres of logged-off lands. The following is a condensed balance sheet of Polson Logging Company *107 as of March 31, 1947: ASSETS
Cash
$2,425,806.44
Accounts Receivable
291,704.69
Post War Refund Bonds
27,405.32
Other Bonds
787.50
Inventories of logs and lumber
and operating supplies
377,689.12
Stock in other corporation
161,700.38
Notes receivable
83,067.54
Standing timber
2,816,410.79
Land and plant sites
461,501.41
Buildings, machinery and equipment
3,696,377.93
Less reserve for depreciation
3,099,222.13
597,155.80
Less realized salvage
(52,502.95)
Spur track and logging road con-
struction less amortization
204,090.27
Deferred charges
75,812.11
$7,470,628.42
LIABILITIES
Current liabilities
$ 588,711.79
Capital stock and surplus
Preferred stock, 30,000 shares at
$90.00 per share
2,700,000.00
Common stock, 8,000 shares at
$100.00 per share
800,000.00
Surplus
3,381,916.63
Total
$7,470,628.42 The standing timber owned by Polson Logging Company on March 31, 1947, and its book value is shown by the following schedule: M FEET
AMOUNT
Grays Harbor County
Block
362,288
$1,213,208.50
Jefferson County Block
665,719
1,361,206.47
Clallam County Block
129,318
158,863.88
Oregon Block
4,000
5,285.00
Fifteen-year cutting rights
- Jefferson County
33,168
46,427.49
Uncruised growing timber
31,419.45
Total
1,194,493
$2,816,410.79
The following table shows earnings of *108 Polson Logging Company for the years 1935-1946, inclusive, and the portion allocable to the Clark L. Ring Corporation, based on its share of stock ownership.. CLARK L. RING CORPORATION -
POLSON LOGGING COMPANY
ONE-SIXTH INTEREST
Net Profit
Preferred
Per Share
(or loss)
Total
Dividend
Available
Year
Total
one-sixth
Requirements
For Common
1935
($201,777.36)
($ 33,629.56)
$1,920
($ 3.36)
1936
( 16,094.47)
( 2,682.41
1,920
( .27)
1937
( 641,313.12)
( 106,885.52)
1,920
( 10.69)
1938
( 100,291.46)
( 16,715.24)
1,920
( 1.67)
1939
47,333.76
7,888.96
1,920
.60
1940
211,181.23
35,196.87
1,920
3.33
1941
471,407.63
78,567.94
1,920
7.66
1942
571,756.27
95,292.71
1,920
9.34
1943
352,581.27
58,763.54
1,920
5.68
1944
328,043.41
54,673.90
1,920
5.28
1945
146,825.76
24,470.96
1,920
2.26
1946
236,089.28
39,348.21
1,920
3.74
Average for 12 years
117,145.18
19,524.20
1.82
Average for last 10 years
162,361.40
27,060.23
2.56
Average for last 5 years
327,059.20
54,509.87
5.26
Average for last 3 years
236,986.15
39,497.69
3.76 Practically all of the earnings of Polson Logging Company during this period was distributed to its stockholders in the form of dividends on preferred or common stock. As the supply of fir timber diminished the stockholders of Polson Logging considered the sale to a pulp *109 or paper company of Polson's substantial holdings of hemlock, or sale of all Polson's assets to such a concern. In 1945 and 1946 Garrett tried to interest Sound-View Pulp Company and Puget Sound Pulp and Timber Company, which after investigation decided not to buy. Arnold Polson had some conversations with William G. Reed, chairman of Simpson Logging Company, concerning sale of the timber and the railroad owned by Polson. These conversations occurred both before and after March 22, 1947. In the early part of 1947 Simpson offered 5 million dollars in cash plus an additional amount contingent upon total liquidation from the operations up to a total additional amount of 13 million dollars. Negotiations were broken off because the sellers wanted more cash than Simpson could offer. In the summer of 1946 Arnold Polson had discussions with Martin N. Deggeller, vice president of Rayonier, Inc., concerning the purchase by Rayonier of Polson Logging Company stock. In December 1946 and January 1947 Rayonier's cruisers examined Polson's timber. Subsequent to March 1947 Garrett and Merrill were included in the discussions. In August the parties reach a basis of agreement for sale of part of the *110 stock and called upon their attorneys to draft an agreement for the purchase by Rayonier of a controlling stock interest in Polson. The price to be paid was to be computed later. Garrett withdrew from the negotiations and the Polson stock held by Clark L. Ring Corporation was not included in the sale which was effected in November 1947. Garrett offered to sell Rayonier the Clark L. Ring Corporation stock but Rayonier refused. In consummation of the negotiations begun in 1946, Rayonier, Inc., purchased in November 1947, simultaneously, 6,346 2/3 shares (or 79 1/3%) of common stock of Polson Logging Company (out of a total of 8,000 shares of common stock of Polson Logging Company stock then issued and outstanding) from Arnold Polson and other members of the Polson family, (48% of total), Dixmont Company, (16 2/3% of total), and R. D. Merrill Company, (14 2/3% of total), for a price of $1,846 per share. Clark L. Ring Corporation could have sold its Polson stock at the same time and for the same price as a part of that transaction. On November 18, 1947, the stockholders of Clark L. Ring Corporation by unanimous voted adopted a resolution dissolving the corporation. A consent to such dissolution *111 signed by all stockholders was filed in the office of the Secretary of State for the State of Delaware on December 22, 1947, and the Secretary of State issued a certificate of dissolution on December 22, 1947, attesting to the dissolution of the company. The assets of the company, consisting almost entirely of 1,333 1/3 shares, or 16 2/3 per cent of the common and 5,000 shares of prefered stock of Polson Logging Company were distributed to the common stockholders of Clark L. Ring Corporation. Subsequent to the sale of Polson stock to Rayonier, Inc., Garrett offered to sell to Simpson Logging Company the Polson stock formerly owned by the Clark L. Ring Corporation. Simpson refused as it was not interested in acquiring one sixth of the Polson stock at any substantial price. In August of 1948 the Polson Logging Company was dissolved in accordance with statutory procedure by a vote of more than two thirds of the stockholders. By agreement with Rayonier, Inc., the then principal stockholder, the estate of the decedent as well as other former stockholders of Clark L. Ring Corporation received cash for their distributive share of the assets. Distribution to decedent's estate on dissolution *112 was made on the basis of $1,880 per share for common stock and $99 per share for preferred stock of Polson Logging Company. The net amount received by the decedent's estate, after certain items of expense, on account of liquidation of Clark L. Ring Corporation and Polson Logging Company was $357,443.27 on account of the decedent's 1,251 1/3 shares of common stock of Clark L. Ring Corporation or $285.65 per share. The 1,251 1/3 shares of common stock of the Clark L. Ring Corporation owned by the decedent had a value on March 22, 1947, of $357,443.27. The Ring Company was an investment holding company in process of liquidation. For the period ending December 31, 1946, it had gross income of $981.01 and net profit after taxes of $389, which was distributed to its stockholders. Also, $2,151 was distributed from capital to the common stockholders. For the year 1947 its gross income was $8,976.01, its net profit after taxes was $1,227.29 which was distributed to the stockholders and $9,252.71 was distributed from capital to the common stockholders. Further distributions were made from capital in 1948 and 1949 when expenses exceeded income. The company had losses for 1948, 1949 and 1950. *113 Merrill & Ring Canadian Properties, Inc. owned some lands from which the timber had been removed. It was difficult of access and not readily salable. Merrill & Ring owned some timberlands on the west side of the Olympic Peninsula which contained principally cedar and which were difficult of access. The salability of these lands would depend upon market conditions. No active market existed for these lands. Merrill & Ring had ceased active operations about 1942 or 1943. The following shows (1) the values according to the books and (2) the fair market values of the assets, and the liabilities and capital stock acounts of Merrill & Ring Canadian Properties, Inc., as of March 31, 1947, the fair market values being the same for March 22, 1947: ASSETS
(1)
(2)
Cash
$ 83,178.45
$ 83,178.45
Marketable securities
28,423.55
29,526.05
Accounts and contract
receivable
130,798.65
130,798.65
Logged-off timberlands
246,623.20
276,223.20
Totals
$489,023.85
$519,726.35
LIABILITIES
Accounts payable
6,544.86
6,544.86
Accrued taxes payable
1,229.94
2,634.53
Capital stock (14,200
shares)
14,200.00
14,200.00
Surplus
467,049.05
496,346.96
Totals
$489,023.85
$519,726.35 The following shows (1) the values according to the books and (2) the fair *114 market values of the assets and liabilities and members' capital of Merrill & Ring as of March 31, 1947, the fair market values being the same for March 22, 1947: ASSETS
(1)
(2)
Buildings, machinery
and equipment
$ 34,530.47
$ 59,530.47
Less allowance for
depreciation
16,649.06
23,848.91
$ 17,881.41
$ 35,681.56
Timberlands and
acreage
364,694.49
830,769.35
Current assets
108,606.67
108,606.67
Other assets
48,896.78
48,896.78
Prepaid insurance
1,908.86
1,908.86
Totals
$541,988.21
$1,025,863.22
LIABILITIES
Current liabilities
$ 10,295.53
$ 10,295.53
Reserve
6,494.04
6,494.04
Members' Capital
R. D. Merrill Com-
pany
175,066.22
336,357.89
R. D. Merrill, Trus-
tee for the Dix-
mont Company
175,066.21
336,357.88
Ring Company
175,066.21
336,357.88
Totals
$541,988.21
$1,025,863.22
The following shows the assets and liabilities of the Ring Company as of March 31, 1947. Stocks and bonds are shown at cost in column (1) and at quoted market prices in column (2). Investments in Merrill & Ring and stock in Merrill & Ring Canadian Properties, Inc. , are shown at book value in column (1) and at stipulated fair market value in column (2): ASSETS
(1)
(2)
Cash
$ 8,682.49
$ 8,682.49
Accounts receivable
77.96
77.96
Investments
Merrill & Ring Cana-
dian Properties, Inc.
- one-third capital
stock
160,416.35
170,182.32
Merrill & Ring - one-
third interest
175,066.21
336,357.88
Dominion of Canada
bonds
273,786.25
283,748.00
Other assets
24,428.08
33,285.94
Totals
$642,457.34
832,334.59
Liabilities
$ 3,565.06
$ 3,565.06
Capital stock and sur-
plus
638,892.28
828,769.53
Totals
$642,457.34
$832,334.59
The *115 1,251 1/3 shares of Ring Company common stock had a value on March 22, 1947, of $70,000. The decedent owned 2,700 shares of common stock of Weyerhaeuser Timber Company. On the return this was valued at $159,300 or $59 per share. The respondent valued it at $168,750 or $62.50 per share. This stock was not listed upon an exchange but was traded in over-the-counter transactions. On March 22, 1947, the bid price was $61 and the asking price $63. These quotations were given for trades of 100-share lots. A block of 2,700 shares offered for sale at that time would have had the effect of depressing the market and could have been sold at the bid price by a skillful broker within a reasonable period. The fair market value of the decedent's 2,700 shares on March 22, 1947, was $160,650 or $59.50 per share. Jessie Ring and Edward Garrett were married in December 1911. Jessie inherited property from her mother which was kept separate and had her own bank account. Edward kept books to show the condition of Jessie's investments and expenditures. Edward paid the living expenses out of community income or income from his own properties. Out of his own funds he bought land in the Highlands, a residential *116 section of Seattle, in 1924. In 1936 the Garretts built a home on this land. Jessie paid most of the construction costs out of her own funds. In order to equalize the investment so that each would have paid half the total cost of the home, Edward offered to give Jessie a note. Although Jessie said she did not want his note, Edward signed a note for some 10 or 12 years, without interest, and it was placed in their safe deposit box. Edward had the bookkeeper make entries in Jessie's books showing that he was indebted to her for $28,000. There were other charges and credits to that account. Payments received from the sale of their former home were posted as credits to the account. Some entries concerned an automobile to the purchase of which each spouse contributed. At the end of 1944 a balance of $25,256.85 was recorded as owing Jessie from Edward. During 1942, 1943, 1944 and 1945, Edward had sufficient cash on hand to have paid off this account. Several years before 1947 Jessie told Edward that he owed her nothing and that she had taken his note from the safe deposit box and destoryed it. In 1946 while Jessie was considering a codicil to her will she asked that the record of this obligation *117 be legally cleared. Edward had the books closed by entering "debt forgiven, December 15, 1946" and crediting his account with the amount of the balance. Jessie filed a gift tax return on March 14, 1947, reporting gift as of December 15, 1946, of $25,256.85 as forgiveness of a debt from Edward, and Edward filed a donee's information return giving notice of receipt thereof. Peter Garrett, son of Jessie Ring Garrett, was married in December 1946 and resided in a cottage some 20 miles away from his parents' home. He was earning about $250 per month as a salesman and paid $85 per month for rent. It became necessary to move. His mother desired to have him live nearer her as he had been away from home most of the time for 14 years. A house nearby was available in the Highlands which could be rented for $150 per month. The decedent offered to allow Peter $150 per month for a year if he would take the house and live near her. He accepted the offer and signed a lease for the house beginning with February 1947, and occupied it. After his mother's death Peter and his wife lived with his father for four or five months to help care for the latter's affairs. Peter paid rent for the leased house *118 through June 1947 after which it was sold and the lease was cancelled. Peter bought a new residence in the fall of 1947. His mother had paid him $450 pursuant to this agreement. Peter filed a creditor's claim in the probate proceeding for $1,350 with the explanation: Unpaid balance on commitment of Jessie Ring Garrett to pay to him the sum of $150 per month for a period of thirteen months commencing with December of 1946 and continuing through December of 1947 of which the first four months only were paid. Jessie Anne Nelson is the granddaughter and adopted daughter of Edward I. and Jessie Ring Garrett who cared for her for several years. She was eight years old in March 1947. Pursuant to a petition filed in the probate proceeding by the executor the Superior Court on May 4, 1948, ordered and directed the executor to allow and pay out of the assets of the estate the sum of $400 per month commencing with April 1947 for the care, support, maintenance and education of Jessie Anne Nelson and that the payments shall continue during the period of administration. The cost of support of Jessie Anne Nelson, including a portion of the cost of maintaining the family residence, has been in excess *119 of $800 per month since April 1947. The estate has not been closed. It has been held open pending the termination of this proceeding. Opinion The respondent determined that the decedent's 1,251 1/3 shares of common stock of Clark L. Ring Corporation had a value on March 22, 1947, of $357,443.27. This was the amount ultimately realized in August 1948 in respect of these shares following the dissolution of the corporation and of Polson Logging Company. The petitioner contends that on March 22, 1947, the value of the decedent's Clark L. Ring Corporation common stock was not in excess of $60 per share, or about $75,000. The parties agree that the value depends upon the value of the Polson Logging Company stock, the principal asset held by the corporation. This stock amounted to one-sixth interest in Polson, which was a closely held company. Polson's stock was not listed or traded except for the sale of a majority interest in November 1947. The petitioner contends that the Polson stock should be valued according to the factors of net worth, earning power, dividend paying capacity and the value of stocks of companies engaged in the same business which are listed upon exchanges. Insofar *120 as considering the sale of Polson stock in November 1947 as a measure of its value is concerned, the argument is that the discussions had not progressed in March 1947 to the stage where a sale at such a price could be foreseen, and that Rayonier was willing to and did pay a price higher than fair market value in order to acquire the convenient Polson timber and prevent the erection of a competing pulp mill in its area. It is also argued that the value of the minority interest in Polson held by Clark L. Ring Corporation was not as great per share as the controlling interest bought by Rayonier which took the stock only as a means of acquiring the desired timber. Three witnesses experienced in the valuation of stocks estimated the value of the decedent's Clark L. Ring Corporation stock as of March 22, 1947, at $51, $60 and $67.57 per share. These estimates were made upon calculations based principally upon earnings, dividends and assets and comparison with listed stocks of companies in the logging industry. The difficulty with these estimates of value is that they assume Polson was principally an active logging company. But Polson had ceased long before to be profitable as an operating *121 company. Its sawmill equipment was antiquated, its internal dissentions had impaired its functioning, its supply of fir timber suitable for lumber was nearly exhausted, and it had no facilities for profitable use of its substantial stands of hemlock, which were desirable for pulp but unsuited for lumber. The value of Polson's stock based upon earnings would necessarily be low in view of these conditions and valuations based upon earnings were not realistic since Polson possessed assets of enormous potential value. The chief asset was the hemlock which was valuable for pulp. Garrett and Arnold Polson had both anticipated the exhaustion of the fir timber and had sought to interes pulp concerns in the hemlock. Two pulp companies had made investigations at Garrett's suggestion but declined to buy. We are not told of any price suggested to these concerns. Simpson Logging Company offered 5 million dollars for Polson's stock plus an additional amount dependent on what was realized from the pulpwood, which might amount to a total payment of 18 million dollars. This offer appears to have been made shortly after March 1947. The net book value of Polson's assets was about $6,900,000 and the timber *122 was carried at about $2,800,000. The price of timber had been on the uptrend since the lifting of price controls and the potential value of the timber stands was obviously greatly in excess of the book value. The discussions with Rayonier had not progressed by March 1947 to the point that Garrett and Merrill were consulted, but the timber had been examined and it was not long after March that prices were discussed. By August 4, 1947, the interested parties had agreed on the sale and the basis upon which the price was to be computed. The ultimate amount paid by Rayonier for the Polson assets was about 15 million dollars. There was no material economic change in the period between March and August or November 1947 which would affect the value of this property. Clark L. Ring Corporation could have sold its Polson stock at the same time the other stockholders sold and at the same price. We think the evidence fails to show error in the respondent's determination and it is sustained. The decedent owned one eighth of the common stock of the Ring Company. The respondent valued this stock at $102,623 or $82 per share. The estate tax return reports a value of $61,077.64 or $48.80 per share for *123 the decedent's interest. The Ring Company was a family holding company organized in November 1946 to hold certain assets transferred from the Clark L. Ring Corporation. It was not engaged in any business. It derived some interest from Canadian bonds. Its other principal assets were a one-third interest in Merrill and Ring, a joint venture, and one third of the capital stock of Merrill & Ring Canadian Properties, Inc. Neither of these was engaged in any business activities, nor was any active operation expected or contemplated. The fair market values of the assets of these two concerns are stipulated. The respondent has valued the Ring Company stock at the proportionate share of the stipulated fair market values of the underlying assets. We do not think these values are necessarily determinative of the value of the Ring Company stock. The fair market value of the underlying assets is but one factor to be considered. We are here concerned with a minority interest in a family holding company whose principal assets were nonlisted stock in a closely held corporation and an interest in a joint venture, neither of which was engaged in active business operations. Cf. Richardson v. Commissioner, 151 Fed. (2d) 102. *124 Under certain circumstances it has been held that such interests in family corporations or ventures have a fair market value less than the proportionate share of the underlying assets. Estate of Irene DeGuebriant, 14 T.C. 611, revd. on other grounds (C.A. 2, 1951) 186 Fed. (2d) 307; Blackard v. Jones, 62 Fed. Supp. 234; Wishon v. Anglim, 42 Fed. Supp. 359; and Goss v. Fitzpatrick, 97 Fed. Supp. 765. We think the circumstances here require a similar conclusion. Witnesses for the estate have estimated the valuation of the decedent's interest in the Ring Company common stock at $51,799 and $37,500. We think these estimates are too low as is also the valuation stated in the return, and, after giving consideration to all the facts of record, we have found the value of the Ring Company stock to be $70,000. The Weyerhaeuser Timber Company stock was not listed on a stock exhange but was traded in over-the-counter transactions. On March 22, 1947, the bid price was $61 and the asked price $63 per share. These quotations were for 100-share lots. The decedent owned 2,700 shares. A block of this size, if offered for sale at one time, would have had the effect of depressing the market and *125 could not have been sold by a skillful broker within a reasonable period at the current bid price. If handled by a broker it would be considered a wholesale transaction and involve an expense netting a price below that experienced in trading 100-share lots. See Commissioner v. Shattuck ( C.A. 7, 1938) 97 Fed. (2d) 790. The estate tax return reported a value of $159,300 or $59 per share. The petitioner's brief requests a finding that the fair market value on March 22, 1947, was $59.50 per share; and we have so found. The respondent determined that "The value of the debt of decedent's husband Mr. Edward I. Garrett, which was forgiven in the amount of $25,256.86 by decedent in 1946, is held to be includible in the value of the gross and net estate, as a transfer made in contemplation of death, within the meaning of Section 811 of the Internal Revenue Code." The respondent points to the bookkeeping record of the debt, and to the gift tax return reporting its forgiveness as of December 15, 1946, and Garrett's notice of receipt thereof which were filed in March 1947 and calls attention to the fact that Mrs. Garrett had suffered a heart attack a few months before her death as establishing *126 that this was a gift made in contemplation of death. The facts revealed by Garrett, however, show that his wife refused to recognize that he owed her anything. Although she received the note at his insistence, she destroyed it and so informed him. When she was considering a codicil to her will she asked that the record showing this purported debt be cleared up. The returns were made pursuant to this request and the explanation made in the estate tax return was consistent with this action. The request to cancel the record was probably made in contemplation of death, but we doubt that any debt actually existed. Garrett's insistence on recording the supposed obligation to his wife and giving her a note was countered by her destruction of the note and her determination to have the record eliminated. If a debt existed, it was forgiven years before 1946, and the clearing of the record was pursuant to an intent formed long before that year. The respondent mistakes the intent to eliminate the record of the supposed debt as the decision to forgive it. The respondent erred. The respondent disallowed a deduction claimed on the return for $13,500 as a contractual obligation to Peter Garrett, the *127 decedent's son. The reason given for the disallowance was lack of consideration in money's worth. Under the applicable regulations a claim founded upon a promise or agreement is limited to the extent that liability was contracted in good faith and for an adequate consideration in money or money's worth. (Regulations 105, Sec. 81.36). The decedent agreed to pay Peter $150 per month for the time he rented a certain house to be living near her after having been away from home for some 14 years. The house was occupied in February 1947 and rent was paid for the months of February through June. The decedent paid $450 pursuant to the agreement. The consideration to the decedent for the promise was filial love and affection which is not an "adequate consideration in money or money's worth." No error in the respondent's disallowance of this item has been shown. The respondent disallowed a deduction claimed on the return in the amount of $14,400 for support of Jessie Anne Nelson. Upon application of the executor, the court having jurisdiction of the estate authorized and directed payment out of the estate of $400 per month for support of the eight-year-old adopted daughter of the Garretts, to *128 continue for the period of administration of the estate. The respondent contends that the present case involves a non-intervention will which under state law dispenses with probate administration, except for preliminary requirements, and that it was the duty of the executor immediately to establish the trust created by the will and since the will directed the trustees to pay from the trust income the sum of $400 per month for the support of Jessie Anne Nelson, the provision for an allowance by the court pending settlement of the estate was unnecessary. The respondent also contends that the estate could have been settled long ago and any such allowance, if justified at all, should have been terminated. The respondent cites In Re Williamson's Estate, 229 Pac. (2d) 312 (1951) which involved a non-intervention will establishing trusts and directing payment of income to certain life beneficiaries. It was there held that in the absence of a provision in the will postponing payment of trust income until after a decree of distribution it became the duty of the trustees to pay income as soon as it became available and that the beneficiaries of a non-intervention will had the right to receive *129 income from the date of death. The court considered the trusts as operative immediately after death. In that case the executors and trustees were the same persons and the practical difficulties existent in the present situation where the executor and the trustees are different were not considered. While this is a non-intervention will, there are several steps to be taken as prescribed by the statute. The will must be admitted to probate, an inventory made and filed, a decree of solvency made by the court, and notice to creditors must be given as provided by law requiring claims to be filed within six months. When the estate is ready to be closed the court after notice must enter a decree naming the heirs and distributing the property to the persons entitled thereto. Washington Revised Code, section 11.68.010. The administration of the estate necessarily requires a period of time before the executor here may transfer the residue to the trustees named in the will. The Revised Code of Washington, section 11.52.040, authorizes the court to make such reasonable allowance of cash out of the estate as may be necessary for the maintenance of the family according to their circumstances during *130 the progress of the settlement of the estate. Since March 1947 the home has been maintained for the benefit of Garrett and Jessie Anne Nelson. The cost of support of Jessie Anne, including part of the cost of maintaining the home, was in excess of $800 per month. The amount of $400 per month was authorized by the court to be paid out of the estate and was actually expended. The trust provided for in the will embraced the residue of the estate after payment of all debts, bequests, fees and taxes. The trustees were the People's National Bank, Edward I. Garrett and Edward Peter Garrett. It was the responsibility of the executor, not the trustees, to administer the estate and pay debts and taxes. The trustees are not in possession of the trust corpus and are unable to pay the trust income to the named beneficiaries until the trust corpus is distributed to them. Under section 83.52.010 of the Revised Code of Washington[1] *132 the executor was barred from distributing the estate until he could file a receipt showing payment of the state inheritance tax or evidence that satisfactory provision was made for its payment. Under section 83.40.040[2] the valuation of the estate for inheritance tax purposes *131 is to be increased to conform to any increase for federal estate tax purposes resulting through a final determination or agreement. Under section 83.40.010[3] *133 the state inheritance tax, if less than the maximum allowable as a credit against the federal estate tax, is to be increased to that maximum amount. Until the amount of the estate tax is determined in this proceeding, the state inheritance tax is not ascertainable. Until the state inheritance tax is determined and paid, the estate cannot be distributed to the trustees and they cannot pay the amount of trust income directed to be paid to Jessie Anne. Necessarily, the estate is still in administration and the allowance granted is a proper deduction until the estimated date of closing the estate. The petition requests the deduction of the continuing allowance until the estate is closed. Decision will be entered under Rule 50. Footnotes
1. 83.52.010 No decree of distribution until tax paid. An executor, administrator, or trustee shall not be discharged from liability for inheritance tax, nor shall a decree of distribution be entered, nor an estate, or part thereof, be distributed until a receipt signed by the state treasurer showing that the inheritance tax is paid, or written waiver executed by the tax commission showing that the estate is not subject to inheritance tax, or written acknowledgment by the tax commission that provision for payment of the tax has been made to its satisfaction is filed with the clerk of the court, or the court having jurisdiction over such estate has determined as herein provided that such estate is not liable to pay an inheritance tax. 2. 83.40.040 Valuation to be adjusted according to federal appraisement. If after the values have been determined under this title for inheritance tax purposes, the same estate is valued under the federal estate tax statute and the value of the property, or any portion thereof, fixed under the federal law, is increased above the value theretofore fixed under the inheritance tax provisions of this title, and this valuation under the federal estate tax is accepted by the estate either by agreement or through final determination in the federal court, the value as fixed under the inheritance tax provisions of this title upon such property or portion thereof shall be increased to this amount. ↩
3. 83.40.010 Absorption of eighty percent federal estate tax credit. Where the tax imposed by the inheritance tax laws of this state is of a lesser amount than the maximum credit of eighty percent of the federal estate tax allowed by the federal estate tax act, then the tax imposed by the inheritance tax laws of this state shall be increased so that the amount of tax due the state shall be the maximum amount of the credit allowed under said federal estate tax act. * * *